The COUNTY OF OAKLAND, by George W. KUHN, the Oakland County Drain Commissioner, Alice L. Schoenholtz, David Snyder, and all other persons similarly situated who are end users of the Detroit Sewage System, Plaintiffs,

v.

VISTA DISPOSAL, INC., Defendant,

and

The United States of America, Auxiliary Defendant.

Civ. A. No. 86–74656.

United States District Court, E.D. Michigan, Southern Division.

Sept. 26, 1995.

Robert P. Hurlbert, Dickinson, Wright, Moon, Vandusen & Freeman, Bloomfield Hills, MI, for Alice Schoenholtz, County of Oakland.

Brian P. Gettings, Cohen, Gettings & Dunham, Arlington, VA, Philip G. Tannian, Tannian & Assoc., Detroit, MI, James I. Rubin, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, Jon R. Steiger, Dickinson, Wright, Moon, Vandusen & Freeman, Bloomfield Hills, MI, for County of Oakland.

Elizabeth W. Fleming, United States Attorney's Office, Detroit, MI, for the U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GADOLA, District Judge.

Plaintiff Oakland County brought this action alleging that it lost millions of dollars as a result of a conspiracy engaged in by Vista Disposal, Inc. ("Vista") and other individuals and business entities in violation of the Rack-

eteer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Oakland County settled its claims against many of the conspirators and was granted a default judgment against Vista in the instant action. After entry of the default judgment, Oakland County named the United States as an auxiliary defendant, seeking to recover the funds which the United States collected from Vista and the conspirators pursuant to forfeiture orders. Oakland County argued that the United States is holding that money for Oakland County in a constructive trust.

The United State filed a motion to set aside Oakland County's default judgment against Vista. On December 23, 1993, this court issued an order entitled "Order Denying the United States' Motion to Set Aside Default." The court made the following rulings: First, to recover any funds in the possession of the United States, Oakland must prove it was injured by the RICO conspiracy. If Oakland can prove it was injured by the RICO conspiracy, then Vista and the conspirators held Oakland's property in constructive trust and therefore Oakland's rights thereto are superior to the rights of Vista and the conspirators. The United States, through forfeiture, steps into Vista's shoes. If Oakland can trace its property from Vista to the United States, then Oakland can recover its property from the United States.

The court held a bench trial to determine: (1) whether Oakland suffered an injury as a result of the RICO conspiracy; (2) the amount of the injury; and (3) whether Oakland County is entitled to recover funds from the United States which were forfeited from Vista and the conspirators. Below are the court's findings of fact and conclusions of law.

## I. *FINDINGS OF FACT*

In 1979, the Detroit Water and Sewer Department (DWSD) entered into a consent judgment in an action filed against the DWSD by the Environmental Protection Agency challenging the efficacy of the DWSD's treatment of sewage.[1] In order to fulfill the requirements of the consent judgment, the DWSD entered into a sludge disposal contract with Michigan Disposal, owned by Michael Ferrantino. The terms of Michigan Disposal's contract, PC–439, guaranteed Michigan Disposal a minimum of 100 tons/day. As of February 1980, Mr. Ferrantino controlled all the sludge disposal from the City of Detroit.

The DWSD needed a second source of sludge disposal. Mr. Ferrantino offered the DWSD a special deal if he could continue to keep all the business. Ferrantino proposed that if he were offered all the sludge hauling business, he would haul any sludge over 800 tons per day for $28. The DWSD refused Ferrantino's offer. Subsequently, Ferrantino conspired with Jerry Owens, Darralyn Bowers, Sam Cusenza and Joseph Valentini to set up a new corporation, Vista, to secure the DWSD's second sludge hauling contract. Ferrantino and Bowers exercised significant control over Vista, which at the outset had no assets, no experience and no equipment. On October 20, 1980, Vista was awarded the second sludge hauling contract for the City of Detroit, PC–483. The Vista proposal was the only one which had access to a 24 hour a day, seven day a week landfill. The access to the landfill was acquired through Ferrantino. In November 1980, the conspirators began to pay significant sums of money to the director of the Wastewater Treatment Plant, Charles Beckham.

Oakland County sewers are physically connected to the sewer mains which run into the Detroit Waste Water Treatment Plant (DWWTP) operated by the DWSD. The Oakland County Drain Commissioner is responsible for sending Oakland's waste water flows to the DWWTP. Oakland, by contract, pays the DWSD for treatment of its waste water flows. Oakland is charged a fixed rate per cubic foot of waste water, as measured by meters for all flows sent by Oakland's three constituent districts to the DWSD. The rate the DWSD charges Oakland is determined by a computerized rate model which allocates among all who send waste

---

1. It is ironic that the EPA action to clean up Detroit resulted in the severe moral decay of a number of Detroit's citizens.

water to the DWWTP costs involved in operating and maintaining that facility and disposing of waste water flows. The rates are adjusted annually to reflect changing costs. The costs of sludge stabilization and disposal are allocated by the rate model among all system users on the basis of waste water flow volumes. As a consequence, the cost of the Vista sludge disposal contract, PC–483, was allocated among the rate payers of the DWSD and passed on to each rate payer on the basis of flow volume.

The Vista sludge disposal contract was in effect and Vista was disposing sludge during the period of January 23, 1981 through October 22, 1983. The DWSD operates on a fiscal year basis, July 1 through June 30. Therefore, although Vista did not dispose of sludge after October 1983, some of its proceeds were earned in the 1984 fiscal year. Oakland's flow contributions (by percentage) to total flow volumes received by the DWWTP during DWSD fiscal years 1981 through 1984 were:

| | |
|---|---|
| 1981: | 18.17% |
| 1982: | 18.99% |
| 1983: | 19.66% |
| 1984: | 19.43% |
| Total average: | 19.05% |

During the period Vista was hauling sludge from the DWWTP pursuant to contract PC–483, Oakland paid the DWSD for its flows, in accordance with then current rates, $63,201,-277. Vista was paid $16,317,428 by the DWSD in gross revenues during the life of PC–483. Of this sum, applying the annual percentages allocable to Oakland's flow volumes, Oakland contributed $3,141,084. Vista's sole source of income was revenue from the DWSD received pursuant to contract PC–483. The prices charged by the receiver who operated Vista were not altered during the receivership period.

In 1983, the United States indicted Charles Beckham, Darralyn Bowers, Michael Ferrantino, Sam Cusenza, Joseph Valentini and Charles Cusenza in criminal proceeding 83–CR–60070–DT.[2] At trial, the United States proved that the conspirators conducted Vista's affairs through a pattern of racketeering activity comprised of multiple acts of bribery. The indictment charged Bowers, Ferrantino, Cusenza and Valentini with giving Beckham gifts and money to influence his actions relating to the award, execution, performance and interpretation of contract no. PC–483. Bowers, Cusenza and Valentini were convicted on this count. The United States also proved that the conspirators willfully devised a scheme to defraud the people of Detroit and the Metropolitan Detroit area and obtain City of Detroit contract no. PC–483 by means of false and fraudulent pretense for the purpose of obtaining said contract and money.

At the time of the indictment, Vista was placed in the hands of a receiver, Michigan Circuit Court Judge Theodore Bohn, under the supervision of Senior United States District Court Judge John Feikens. Judge Bohn operated the Vista activities in receivership from the time of the indictment until the funds were disbursed by order of Judge Feikens, a period extending from March, 1983 to February, 1984.

Pursuant to the convictions secured in its criminal RICO case, the United States filed a motion before United States District Court Judge Robert DeMascio to forfeit, on an *in personam* basis, money and property acquired and utilized in the RICO conspiracy. On January 31, 1984, the United States District Court granted the United States' Motion for Forfeiture against the three criminal defendants. On the basis of the criminal convictions, the United States was granted a Forfeiture Order against Vista. The United States secured: $360,000 from Bowers; $100,000 from Cusenza; $100,000 from Valentini; and $1,808,052 from the receiver for Vista. These funds were deposited into the United States' treasury general fund.

### A. Injury by RICO Conspiracy

■ The United States argues that Oakland failed to present any evidence that it was damaged by the Vista conspiracy because the acts of bribery in the RICO prosecution occurred after the Vista contract was awarded. During the United States' closing

---

**2.** The facts of the proceedings are elaborated in the opinion of the Sixth Circuit Court of Appeals in *U.S. v. Bowers, et al.,* 828 F.2d 1169 (6th Cir.1987).

argument, the court questioned the United States as to why Vista would need to pay any bribes if it already had a contract. The United States was unable to provide an answer.

The indictment and the subsequent convictions clearly show that one important consequence of the RICO conspiracy was the award of contract PC–483 to Vista. In Count II of the indictment, Darralyn Bowers, Michael Ferrantino, Joseph Valentini and Sam Cusenza were charged, *inter alia*, with conspiring to conduct Vista's affairs through a pattern of racketeering activity comprised of multiple acts of bribery. It was part of the conspiracy that Bowers, Ferrantino, Cusenza and Valentini would give Beckham, a public officer, and then Director of the DWSD, gifts and money "with corrupt intent and purpose to influence the ... action of Charles Beckham on certain matters ... relating to *the award, execution, performance* and interpretation of *Contract No. PC–483* ..." (emphasis added). In Count XI, Beckham, Bowers, Ferrantino, Cusenza, Valentini and Carson, were charged with willfully devising a scheme to defraud the people of Detroit and the Metropolitan Detroit area and obtain City of Detroit contract no. PC–483 by means of false and fraudulent pretense for the purpose of obtaining said contract and money.

During closing argument in the criminal prosecution, the United States argued that the Vista racketeering conspiracy was inconsistent with the interests of the City, which would have been furthered by competitive bidding.

> So, in whose interest would it have also been to get the contract? It would have been Michael Ferrantino's.
>
> Michael Ferrantino would have had a control over the landfill and how much profit he would have gotten from the disposal of sludge, which money went in his pocket
> ...
>
> Best interest of the City? Was Vista Disposal a competitive bid, a competitive bid contract [like] that Michigan Disposal had to undergo? Was it the low bid [like] in 1979? The answer is no.

> *Did this Director of the Detroit Water and Sewerage Department [Beckham] negotiate or make it a minimum qualification that the lowest bidder wins this contract as well as their capacity and ability to deliver on the contract. The answer is no.*

Closing Arguments of Assistant U.S. Attorney Christopher Andreoff, transcript of court proceedings in *United States v. Beckham, et al.*, Crim. No. 83–CR–60070–DT (August 7, 1984) (emphasis added), at p. 2821–22. Bowers was convicted of Counts I (RICO), II (conspiracy RICO), XI–XIV (Fraud and Swindling) of the indictment; Cusenza was convicted of Counts I (RICO) and II (RICO conspiracy); Valentini of Count II (RICO conspiracy); and Beckham of Counts III–XIV, one substantive RICO count, seven Hobbs Act extortion counts and four mail fraud counts.

The court finds that to the extent that Oakland suffered an injury, that injury was caused by the RICO conspiracy. The indictment and subsequent convictions provide clear and convincing evidence that any injury suffered by Oakland was the result of the RICO conspiracy.

## B. Amount of Injury

The measure of Oakland's injury is equal to the difference between the price Oakland paid for the Vista services and what the market price for those services would have been in the absence of the racketeering conspiracy. The starting point for the calculation is the average price/ton charged the DWSD by Vista during contract PC 483. This price was $44.40 per ton. From this number, one must subtract the fair market price/ton determined by an analysis of the available benchmarks. The difference is the overcharge per ton. The overcharge per ton is then multiplied by the number of tons of sludge handled by Vista during PC 483, i.e. 367,507 tons. This calculation yields the total overcharge to all DWSD ratepayers during the life of Vista's contract PC–483. Oakland's share of that overcharge is then calculated by applying Oakland's percentage of the total flow of waste water processed by the DWWTP during each year at issue.

The United States argues that Vista charged the appropriate market price and therefore Oakland did not suffer any injury. Oakland offers several comparisons which it argues are more indicative of the competitive price for sludge hauling services and which prove that Vista did indeed collect excess profits as a result of the conspiracy. The court's decision is difficult in this case because the court is asked to predict what the competitive price would have been had there not been a conspiracy. Certainly, this calculation is difficult to make with a substantial degree of accuracy. The court will address the suggested approximations of the fair market price and explain which price is the most applicable to this action.

### a. Vista—20.97 Comparison

■ Oakland argues that the fairest calculation of Oakland's losses would be to use the results of the sludge hauling contracts signed after Vista's PC–483 expired. In 1983, the DWSD decided to "unbundle" the Vista contract, separating the services of providing lime for sludge stabilization, sludge hauling and land filling. The DWSD awarded the "unbundled" contracts through competitive bids. The City of Detroit also built a larger facility to replace the Vista mixing facility.

Oakland's expert analyzed the data available from DWSD and made many adjustments in order to achieve what he deemed a fair comparison to the Vista contract. He factored out electrical costs because DWSD paid for electricity for both Vista and the DWSD new facility. He scaled down DWSD labor costs for its new and much larger facility to labor costs equivalent to the three on-site workers Vista provided under PC–483. He scaled down DWSD maintenance expenses for its much larger facility to maintenance expenses proportionate to the much smaller facility Vista utilized. He factored out capital costs for each facility because the DWSD paid for both. He accounted for profit, management and overhead expense by referencing each of the "unbundled" contracts which included these items. Oakland's expert concluded that based upon the actual DWSD experience operating with "unbundled" contracts, the best approximation of a

fair market price would have been $20.97 per ton on average. Based upon this conclusion, the difference or overcharge in PC–483 was $23.43 per ton. Multiplying this number by the number of tons Vista handled, 367,507, yields a total overcharge to DWSD ratepayers of $8,610,751, of which Oakland was overcharged $1,657,558.

The United States has attempted to discredit Oakland's expert by indicating many reasons why Oakland County's comparison is inaccurate. The United States argues that the price the DWSD paid after the Vista contract expired was not available during the Vista conspiracy and, even if it were available, it would not have been sustainable for the three year period of the Vista contract. For example, a year after the DWSD unbundled their service contracts, the prices for the trucking contractor increased by one hundred percent. Within three years after the Vista contract expired, the landfilling costs and the trucking charges had each increased by three times. Furthermore, the DWSD did not include some costs in their calculation of prices for the unbundled contracts because the DWSD provided the services itself. As a result, the United States argues that the low $20.97 per ton price which Oakland argues was the fair market price for the entire existence of the Vista contract would not have been achievable in the market for the three year period of the Vista contract.

The court concludes that the costs to the DWSD after the Vista contract expired are not comparable to the costs that would have been achieved if the Vista contract had been awarded without a RICO conspiracy. The two contracts are themselves completely different, providing different services for the DWSD during different years. Further, at the time of the Vista contract, Detroit had built a facility for mixing lime, part of the sludge hauling process, which cost Detroit approximately $400,000. After the Vista contract expired, Detroit built a new mixing facility for $3.4 million. The court finds that the differences between the two contracts are so significant that they do not offer an appropriate comparison for determining what the

free market price for sludge hauling would have been in the absence of the conspiracy.

### b. Vista Receivership Period

■ The court finds that the closest approximation of a fair market price in this action is the sum of the receiver's costs in operating Vista plus a reasonable measure of profit on these costs based upon industry averages. Oakland proposed adding all the receiver's costs, as summarized by the United States' expert,[3] and dividing these costs by the tons of sludge Vista handled during the receivership. This calculation yields a cost of $30.73 per ton during the period of the receivership. Adding a profit of ten percent, which was the reasonable measure of profit on these costs based on industry averages, yields a final price of $33.81 per ton. This number must then be adjusted back to 1981 and 1982 dollars in order to develop a weighted average difference between the actual price per ton that Vista earned and what their costs and normal profits would have been without the conspiracy. In 1982 dollars, the price would have been $32.76. In 1981 dollars the price would have been $30.85. The weighted average price for the entire three year period of the contract was $32.69.

Subtracting the $32.69 figure from Vista's average price of $44.40 per ton yields an overcharge of $11.71 per ton. Multiplying this overcharge per ton by the tonnages handled by Vista, 367,507, yields a total overcharge to all DWSD ratepayers of $4,303,507 during the life of contract PC–483. Of this sum, Oakland was overcharged $828,505.

A fair market price of $32.69 is validated by other data. In November 1980, Ferrantino's company Michigan Disposal, in an arms length transaction, offered to process a comparatively low volume of sludge, 75 tons per day, for the City of Monroe at a price of $31 per ton. Further, in 1981, the conspirators estimated their profit at $16 per ton; therefore, indicating a cost of $28.40 per ton. Lastly, in 1980, Ferrantino proposed to Detroit that he would handle volumes of sludge in excess of 800 tons per day at a price of $28 per ton.

Oakland argues that the $828,505 is the minimum amount of loss which can reasonably be approximated for Oakland County. Oakland also argues that this figure necessarily includes inefficiencies built into Vista and the conspirators' operations which the receiver did not eliminate. The court finds that Oakland has offered no evidence to indicate any specific inefficiencies which the court could include in these calculations. Therefore, the court finds that the appropriate amount of damages suffered by Oakland is $828,505.

### c. Vista—Michigan Disposal Comparison

■ The United States argues that the Michigan Disposal contract obtained by Ferrantino is the most appropriate comparison for the free market price. There is no dispute that the Michigan Disposal contract was acquired without any illegal behavior. Vista's contract price is only slightly more than the Michigan Disposal price. Therefore, the United States argues that Oakland did not suffer any injury. Oakland argues that the fact that the two prices are so closely linked illustrates that Ferrantino was in fact maintaining his monopoly at his monopoly prices.

The court is not convinced by the United States' argument. While the Michigan Disposal contract was acquired legitimately, clearly there was indication that over the year after Ferrantino acquired the contract other competitors were ready to compete for the second sludge hauling contract. The Michigan Disposal contract only guaranteed 100 tons per day to Michigan Disposal and therefore Michigan Disposal could have lost significant business and profits. The reason that Ferrantino became involved in the conspiracy was to prevent a competitor from taking away Ferrantino's business by charging a lower price. Therefore, the court finds a comparison with the Michigan Disposal price inappropriate.

---

3. The only costs which were excluded were the excess legal and accounting costs which were necessary for the special circumstances of a receivership and the payments to Bowers, which were duplicative of the payment to the receiver.

## C. Tracing

Oakland paid DWSD for treatment of its waste from 1981 to 1984. The losses caused to Oakland by excess charges were included in those payments. DWSD then paid Vista and the receiver for its services. The entire sum of excess charges was included in the payments made by DWSD to Vista and the receiver between 1981 and 1984, commingled with the other ratepayers' money. Therefore, all excess charges were clearly in the hands of Vista and the receiver.

▮ The United States argues that Oakland's money was dissipated because approximately $800,000 in cash was stripped from Vista in the first three months of 1983 by the Vista conspirators. If money is redeposited into a fund with the intent to restore trust funds, the redeposited funds are subject to the constructive trust. *Alioto v. United States*, 593 F.Supp. 1402, 1411 (1984); *In re Gottfried Baking Co.*, 312 F.Supp. 643, 645 (S.D.N.Y.1970). In this case, the United States forfeited $560,000 from the conspirators as proceeds of the conspiracy which were removed from Vista. Therefore, the court finds that the $560,000 was a redeposit of the Vista profits into the United States' constructive trust and is therefore subject to Oakland's claims.

▮ In addition to the $560,000 which was attributable to Vista profits before the receivership, Oakland has been able to trace another $684,902.92, also earned before the receivership. The $684,902.92 was the amount of Vista's net assets at the time the receiver took over Vista. The evidence before the court shows that Vista received money only from its contract with the DWSD. The United States argues that the $684,902.92 of net assets which the receiver acquired could not be labeled profits for any particular period because of the lack of adequate records predating the receivership. However, the United States' expert conceded that all of the $684,902.92 came from the ratepayers through DWSD, pursuant to PC–483. If a trustee's actions make it difficult to ascertain just how much money is subject to a constructive trust, the burden shifts to the trustee to establish which property is *not* subject to the trust. *Long v. Earle*, 277

Mich. 505, 526, 269 N.W. 577 (1936). In this case, it was Vista and the conspirators who kept inadequate records. Therefore, the United States, standing in Vista's shoes, must establish that this property is not subject to the trust.

The United States' expert conceded that $1,244,902.92 of the money the United States holds is attributable to the pre-receiver period. This sum includes the $560,000 forfeited from the conspirators and the $684,902.92 which predated the receiver. Because Oakland has traced its funds to both those amounts, it can recover for its injury from both of those amounts.

▮ Oakland can also trace its funds into the receivership, which forfeited $1,808,052 to the United States, as profits from the receivership period. The price charged for Vista's services during the existence of the receivership was identical to the price charged for Vista's services before the receivership. Therefore, the overcharge during the period of the receivership is the same as the period before the receivership. The court finds that Oakland was injured by the overcharge during the receivership and therefore can recover from the money forfeited by the United States from the receivership.

## D. Background of this Litigation

### A. Case No. 84–71068

On March 8, 1984, Oakland filed a complaint against Vista and others, in Civil Action No. 84–CV–71068–DT, seeking damages Oakland allegedly suffered from the racketeering conspiracy. The complaint also sought damages for violations of the Sherman Act, 15 U.S.C. §§ 1–7. Defendants in the case were Vista Disposal Inc, the City of Detroit, Coleman A. Young, Michigan Disposal, Inc., Wayne Disposal, Inc., Wolverine Disposal–Detroit, Inc., Wolverine Disposal, Inc., Charles Beckham, Nancy Allevato, as personal representative for the Estate of Michael J. Ferrantino, Sr., Darralyn Bowers, Sam Cusenza, Joseph Valentini, Charles Carson, Walter Tomyn. This action was dismissed for lack of standing.

On January 27, 1989, the Sixth Circuit Court of Appeals reversed the dismissal of case no. 84–71068. On April 14, 1993, this court entered a stipulated order of dismissal with prejudice and without costs in case no. 84–71068. The stipulated order was signed by plaintiff Oakland County and defendants Coleman A. Young, Michigan Disposal, Inc., Wolverine Disposal–Detroit, Inc., Wolverine Disposal, Inc., Charles Beckham, Nancy Allevato, as personal representative for the Estate of Michael J. Ferrantino, Sr., Darralyn Bowers, Sam Cusenza, Joseph Valentini, Charles Carson, and Walter Tomyn.[4] On that date, plaintiff Oakland County had signed a settlement agreement with Michigan Disposal, Inc., Wolverine Disposal–Detroit, Inc., Wolverine Disposal, Inc., Nancy Allevato, as personal representative for the Estate of Michael J. Ferrantino, Sr., Darralyn Bowers, Sam Cusenza, Joseph Valentini, Charles Carson, and Walter Tomyn ("Agreement"). The settlement was related to damages other than the damages attributable to the funds currently held by the United States.

### B. Case No. 86–74656

After the complaint in case no. 84–71068 was dismissed and before the Sixth Circuit reversed the dismissal, Oakland County filed the complaint in the instant action, case no. 86–74656. The complaint filed in the instant action is almost identical to the complaint filed in the 1984 case except that the instant case was filed as a class action. The defendants named in the 1986 complaint were Vista, Darralyn Bowers, Sam Cusenza, Joseph Valentini, Michigan Disposal, Inc., Wayne Disposal, Inc., Wolverine Disposal–Detroit, Inc., Wolverine Disposal, Inc., Charles Beckham, Nancy Allevato, as personal representative for the Estate of Michael J. Ferrantino, Sr. Charles Carson, and Walter Tomyn.

After the Sixth Circuit reversed the dismissal of case no. 84–71068, the district court dismissed case no. 86–74656 as to all defendants except Vista because the remaining issues were identical to the issues unresolved in the 1984 litigation.[5] The instant action (case no. 86–74656) was not dismissed against Vista because the district court had previously granted a clerk's default against Vista. On March 27, 1992, Oakland County was granted a Default Judgment against Vista. The amount of the judgment, before interest and trebling, was $2,011,136.

Oakland had previously attempted to recover from the United States the forfeited funds which were attributable to the Vista conspiracy. On September 19, 1984, in accordance with the procedures then in place under 18 U.S.C. s 1963(c), Oakland County submitted to the Attorney General a petition for remission for the forfeited property. The Attorney General denied Oakland County's petition for remission on April 23, 1993.

On February 26, 1993, Oakland filed a petition for proceedings supplementary to judgment in connection with funds of Vista held by the United States in the instant action (case no. 86–74656), naming the United States as auxiliary defendant. In the petition, Oakland argued that the United States was in possession of all the Vista Property after obtaining orders of forfeiture in criminal case no. 83–60070 for Bowers' interest in the Vista property and funds formerly owned by Vista and transferred to the three criminal defendants.

On June 21, 1993, this court denied the United States' motion to dismiss this action. *County of Oakland by Kuhn v. Vista Disposal, Inc.*, 826 F.Supp. 218 (E.D.Mich.1993). The court held that the United States had denied Oakland its due process rights by not providing a hearing for the determination of Oakland's petition for remission. The court further held that Oakland's interest in the funds which the United States forfeited from the Vista conspirators, if any be found, exists in the form of a constructive trust. Oakland would have to prove that the Vista conspirators held Oakland's money in constructive trust. The court then held that the interest acquired by the United States could be no greater than the conspirators' interest at the time the conspirators committed the criminal

---

4. Vista had been dismissed voluntarily over a year before this stipulated order was entered.

5. The court also denied class certification.

acts. Therefore, if Vista held Oakland's money in constructive trust, then the United States would be found to hold Oakland's money in constructive trust. The court further held that Oakland would have to trace its injury to the funds held by the United States.

■ On December 23, 1993, this court denied the United States' motion to set aside the default judgment against Vista. *County of Oakland by Kuhn v. Vista Disposal, Inc.,* 840 F.Supp. 75 (E.D.Mich.1993). The court held that the United States had no standing as a party to the judgment or as a party's legal representative and therefore did not consider the United States' claim that the judgment against Vista should be void as a matter of law. The court did note that the default judgment against Vista did not have preclusive effect against the United States because in order for Oakland to assert collateral estoppel it would have to show that the issue was actually litigated. Default judgments do not fulfill the "actually litigated" requirement and therefore do not have collateral estoppel effect. Relying on its June 21, 1993 decision, the court reiterated the issues to be litigated in this action: To recover any funds in the possession of the United States, Oakland must prove it was injured by the RICO conspiracy. If Oakland can prove it was injured by the RICO conspiracy, then Vista and the conspirators held Oakland's property in constructive trust and therefore Oakland's rights thereto are superior to the rights of Vista and the conspirators. The United States, through forfeiture, steps into Vista's shoes. If Oakland can trace its property from Vista to the United States, then Oakland can recover its property from the United States.

Having held a bench trial and determined the facts in this action, the court will proceed to discuss the conclusions of law.

## II. *CONCLUSIONS OF LAW*

■ Oakland has proven by clear and convincing evidence that the conspirators defrauded Oakland County. Michigan law requires evidence to be "clear and convincing" in order to establish fraud. *Disner v. Westinghouse,* 726 F.2d 1106 (6th Cir.1984). The facts establishing the wrongdoing were determined in the criminal proceedings against the conspirators.

■ The measure of civil damages under RICO is the harm caused by the predicate acts constituting the illegal pattern. *Ticor Title Insurance Company v. Florida,* 937 F.2d 447 (9th Cir.1991). In this action, the measure of the harm caused by the RICO conspiracy is the difference between the price charged by Vista to the DWSD and the price which would have been charged in the absence of a RICO conspiracy.

■ Oakland has proven by a preponderance of the evidence that property belonging to Oakland County was acquired by Vista through wrongdoing. *Order Denying United States' Motion to Set Aside Default Judgment,* p. 5 (Gadola, J. Dec. 23, 1993); *MacKenzie v. Fritzinger,* 370 Mich. 284, 292, 121 N.W.2d 410 (1963); *Grasman v. Jelsema,* 70 Mich.App. 745, 752, 246 N.W.2d 322 (1976); *Kammer Asphalt Paving Co. v. East China Twp. Schools,* 443 Mich. 176, 188–89, 504 N.W.2d 635 (1993). The United States argues that the standard for establishing a constructive trust is clear and convincing evidence. The one case cited by the United States for this proposition, *Beachum v. Bay Valley Assoc,* 120 Mich.App 412, 328 N.W.2d 54 (1982), did not in fact hold that a constructive trust must be proven by clear and convincing evidence. The court in *Beachum* only held that the "clear and convincing" standard is an integral part of the civil jurisprudence of this state. In *Beachum,* where the parties argued, *inter alia,* over an alleged oral contract of employment, the court upheld the lower court's instruction to the jury utilizing the preponderance of the evidence standard. Therefore, the court reconfirms its earlier holding that the appropriate standard applicable to the establishment of a constructive trust is a preponderance of the evidence standard.

■ The United States obtained the Vista property pursuant to *in personam* forfeiture orders. As a result of this forfeiture, the United States obtained no more than the interest which the Vista criminal defendants held in the Vista property. *Order Denying*

*United States' Motion to Dismiss,* pp. 9–10 (Gadola, J. June 21, 1993, published 826 F.Supp. 218 (E.D.Mich.1993)). Oakland's interest in the overcharged funds which are part of the forfeited property is superior to the interest the United States acquired in those funds. *Order Denying United States' Motion to Dismiss,* pp. 9–10 (Gadola, J. June 21, 1993, published 826 F.Supp. 218 (E.D.Mich.1993)). Oakland has established that the Vista conspirators held the amount overcharged to Oakland in constructive trust. Therefore, the United States holds the funds which were overcharged by Vista to the ratepayers in constructive trust.

■■■■ The amount of harm or loss suffered as a result of fraud is proven by a preponderance of the evidence. *Crane v. Wood Motors,* 53 Mich.App. 17, 23, 218 N.W.2d 420 (1974). As so eloquently explained by the Supreme Court in *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1930):

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such a case, while the damage may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*Id.* at 563, 51 S.Ct. at 250. The Supreme Court further pronounced that any uncertainty caused by defendant's wrongful acts should be borne by the defendant. *Id.* In *Thompson v. Paasche,* 950 F.2d 306, 313 (6th Cir.1991), a case involving a RICO conspiracy, the Sixth Circuit held that under Michigan law, once a plaintiff has established that there are damages, the plaintiff will not be precluded from recovering because he is unable to demonstrate the precise amount of damages. The court has determined that Oakland County has proven by a preponderance of the evidence that it suffered actual injury of $825,505.

■■■ In order to obtain a constructive trust, the plaintiff must identify specific property as the res of the trust to which he is entitled. G. Bogert and G. Bogert, *The Law of Trusts and Trustees* § 471, at 9 (2nd Rev.Ed.1978). The beneficiary of a constructive trust need not identify the actual coins or bank notes in order to identify the funds subject to a constructive trust. 76 Am. Jur.2d, *Trusts,* § 252 at 475. It is sufficient for a beneficiary of a constructive trust to trace the flow of funds from one repository to the next, even if they change state and form. *In re Swantek Estate,* 172 Mich.App. 509, 517–518, 432 N.W.2d 307 (1988). The beneficiary can also trace the funds if they are commingled with other trusts and funds. *Long,* 277 Mich. at 526, 269 N.W. 577; 76 Am.Jur.2d, *Trusts,* § 259 at 480. If the trustee's actions make it difficult to ascertain just how much money is subject to a constructive trust, the burden shifts to the trustee to establish which property is not subject to the trust. *Long,* 277 Mich. at 526, 269 N.W. 577. If money is redeposited into a constructive trust fund with the intent to restore trust funds, the redeposited funds are subject to the constructive trust. *In re Gottfried Baking Co.,* 312 F.Supp. 643 (S.D.N.Y.1970). The court finds that Oakland has traced the funds it paid to Vista in excess of the market price to the hands of the United States.

■■■ The United States has asserted that certain tax liens may take priority over Oakland's claim to the trust res. However, tax liens served before 1990 expire after six years. Even under the current, ten year statute, these liens, served in November, 1983, have expired. *See Internal Revenue Code,* §§ 6322, 6502, 26 U.S.C. §§ 6322, 6502.

■■■ The court finds that Oakland is only entitled to receive a pro rata share of the funds currently held by the United States. The United States holds Vista's funds in constructive trust for all the ratepayers who were overcharged by Vista. Therefore, Oakland is only entitled to 19.05% of the funds currently held by the United States. The United States took possession of $2,868,052. Oakland's pro rata share this amount is

$543,363.91. Although Oakland's injuries exceed their pro rata share of the forfeited funds, Oakland is only entitled to its pro rata share of the overcharges recovered by the United States from Vista through forfeiture. Palmer, *The Law of Restitution*, § 2.18; Restatement, *Restitution*, § 213.

■ Lastly, Oakland County argues that it is entitled to the benefit the United States has derived from holding Oakland's property, i.e. the amount of money earned by the United States on the forfeited funds. In other cases, it would be the right to interest income. The United States argues that Oakland is not entitled to interest on any award against the United States. In *United States v. Metmor Fin., Inc.*, 819 F.2d 446 (4th Cir. 1987), the Fourth Circuit held that the United States takes an interest in the property that is subject to the interests of innocent third parties, obtained prior to seizure, that were paramount to the wrongdoer's interests. "The government can succeed to no greater interest in the property than that which belonged to the wrongdoer whose actions have justified the seizure. The government denies that it is benefitting from an interest-free loan at Metmor's expense. We think otherwise.... In any event, the proper consideration is Metmor's loss, and not the government's gain. From that perspective, Metmor has clearly lost nearly two years worth of accumulated interest." *Id.* This analysis is applicable to the instant action. In this action, the United States acquired the Vista funds through forfeiture, subject to Oakland's paramount interest. Part of Oakland's interest (an ownership interest because the money was illegally taken) is the right to appreciation of the property, or interest. To hold otherwise would be to require Oakland to provide the United States with an interest free loan. This scenario is exactly the same as the one presented by the court in *Metmor*.[6]

The United States tries to limit *Metmor* by arguing that interest can only be paid if there is a contractual right to interest. It is true that, under *Metmor*, interest, attorney's fees, and other charges may only be given to a lienholder if he has a right to them under his contract. E.g., *United States v. Fed. Nat'l Mortgage Ass'n*, 946 F.2d 264 (4th Cir. 1991). In the case of a lienholder, the lienholder's interest in the property, paramount to that of the Government, is defined by contract. Here, Oakland's interest in the property is not defined by contract; it is an ownership interest, interrupted by the illegal taking of the money. Thus, Oakland County's interest in the forfeited funds, paramount to that of the United States, need not be described in a contract to be valid.

Oakland cites one Michigan Supreme Court case, *Weir v. Union Trust Co.*, 188 Mich. 452, 154 N.W. 357 (1915), in which the court held a constructive trust existed and ordered the trustee to pay to the beneficiary the principal of the trust, derived from the sale of land which had been in the trust, plus interest that accrued on the money. This is direct precedent that interest can be paid by the trustee of a constructive trust.

Finally, the United States makes a sovereign immunity argument that interest cannot be ordered against the United States unless there is express statutory authorization for the award of interest. The United States cites a holding made in the context of a Title VII action, *Library of Congress*, 478 U.S. 310, 316, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1986), and a case in which the Tenth Circuit held that a court could not order the payment of interest that was not earned on money, even if it should have been earned. *Merrill Lynch, et al v. Jacks*, 960 F.2d 911 (10th Cir.1992). Both are distinguishable from the present case. In this case, interest was earned on the money. Unlike both the Merrill Lynch case and the Library of Congress case, Oakland is not charging the United States with wrongdoing. The United States is merely being forced to distribute the corpus of a constructive trust to the beneficiary of that trust. This dispute is merely over the amount of the corpus, but has nothing to do with a suit against the

---

6. The United States relies primarily on *United States v. One Piece of Real Estate*, 571 F.Supp. 723 (W.D.Tex.1983). In that case the court held that once the United States seized property subject to a lien, it only had to pay the lienholder principal, but not interest on the lien. This court, as the Fourth Circuit, declines to follow the reasoning in *One Piece of Real Estate*.

United States in the sense that the United States is charged with wrongdoing. Therefore, the court will order the United States to pay to Oakland the amount of interest actually earned by the United States on the money awarded to Oakland.

### *ORDER*

Therefore, it is hereby **ORDERED** that based upon the foregoing findings of fact and conclusions of law, this court orders that judgment be entered in favor of Oakland County in the amount of $546,363.91 plus the benefit derived by the United States from use of the $546,363.91.

**SO ORDERED.**

### *JUDGMENT*

This action came before the court, Honorable Paul V. Gadola, District Judge, presiding, and the issues having been duly reviewed and a decision having been duly rendered,

It is **ORDERED** and **ADJUDGED** that the United States pay to Oakland County $543,363.91 plus the benefit derived by the United States from the $543,363.91.

It is further **ORDERED** that the clerk serve a copy of this judgment by United States mail on the counsel for plaintiff and on counsel for defendant.